**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| STEVEN BENNETT, | |
| Plaintiff, | |
| v. | Civil Action No. 10-CV-2505 AW |
| KAISER PERMANENTE, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Defendant's Motion for Summary Judgment. The Court has reviewed the record and deems a hearing unnecessary. For the following reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

This case sounds in employment discrimination. Plaintiff Steven Bennett is a natural person who resides in the state of Maryland. Defendant Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. (Kaiser Permanente) is a managed care consortium that is headquarted in California and that has offices in Maryland.

Defendant hired Plaintiff as a lead nurse in 1998 at its Camp Springs facility. A lead nurse performs the duties of a registered nurse and has some additional duties. Suzanne McKay-Mahaffey, who is also a registered nurse, supervised Plaintiff. McKay-Mahaffey gave Plaintiff a positive performance appraisal for the year of 2006.

On January 28, 2008, a patient went to the Camp Springs facility to get a TB test. Instead of giving the patient a TB test, Plaintiff injected him with insulin. Evidently, Plaintiff's mistake did not harm the patient.

Shortly thereafter, Plaintiff spoke with McKay-Mahaffey about the incident. Plaintiff told her that he did not know how the mistake happened and that he did not want be a "liability." *See* Pl.'s Dep. 82:11–17, Doc. No. 41-2; McKay-Mahaffey Aff. ¶ 3, Doc. No. 41-4. Plaintiff and McKay-Mahaffey agreed that he should see a doctor to determine if a medical condition caused his error. *See* Pl.'s Dep. 81–82, Doc. No. 41-2; McKay-Mahaffey Aff. ¶ 9, Doc. No. 41-4. McKay-Mahaffey gave Plaintiff a form titled "ADA-Medical Certification" for his doctor to fill out.

On February 11, 2008, Plaintiff's doctor evaluated him. Plaintiff's doctor diagnosed him with the following conditions: diabetes mellitus, post-traumatic stress disorder, sleep apnea, peripheral neuropathy, and fibromas of the feet. Doc. No. 43-1, at 15. In the space corresponding to the question whether any of the medical conditions substantially limited Plaintiff's major life activities, the form states "ability to engage in prolonged walking or standing." *Id.* The form also states that "[i]t is **possible** that the lapse in memory on the date [in] question was [caused] by his chronic pain, sleep disorder [sic]." *Id.* (emphasis added).

Following the medical evaluation, McKay-Mahaffey placed Plaintiff on "Level 4 corrective action," the highest level of discipline before discharge. Partly on the suggestion of Plaintiff's union representative, McKay-Mahaffey discussed the possibility of reassigning Plaintiff to the position of message management nurse with Cynthia Fields, Clinical Coordinator at the Marlow Heights Kaiser medical center. *See* McKay-Mahaffey Aff. ¶ 11, Doc. No. 41-4; Doc. No. 41-3, at 78. The message management nurse position was sedentary, and its duties

included advising patients whether to schedule appointments with doctors and deciding which type of doctor a patient needed to see.

On a March 2008 day, apparently in the morning, Plaintiff received a message indicating that a patient had experienced weakness in her extremities the night before. Plaintiff contacted the patient and asked her about her symptoms. Although Plaintiff ruled out the possibility that the patient was having a stroke, Plaintiff was concerned that she could have been experiencing a medical problem. Plaintiff looked into scheduling the patient to see a primary care physician at the Marlow Heights care center and saw that all of the doctors were booked. Therefore, Plaintiff scheduled the patient to be seen at an urgent care facility at 5:00 p.m. on the same day. Evidently, Plaintiff's failure to schedule the patient to see a primary care physician at the Marlow Heights center did not harm her.

Fields contacted McKay-Mahaffey about the scheduling incident. Fields stated that she no longer wanted Plaintiff to work as a message management nurse. McKay-Mahaffey placed Plaintiff on administrative leave and initiated an investigation. McKay-Mahaffey determined that the patient had experienced stroke-like symptoms and that Plaintiff did not discuss scheduling her to be seen at an urgent care facility later that day with her doctor. McKay-Mahaffey concluded that Plaintiff endangered the patient. Therefore, on or around March 20, 2008, McKay-Mahaffey gave Plaintiff the option of resigning or being fired. Plaintiff chose to resign.[1] There is no evidence that Plaintiff requested a disability accommodation after the scheduling incident.

Plaintiff filed a charge of discrimination in September 2008. Doc. No. 43-1, at 17. In the charge's section for "particulars," Plaintiff specifies that "I believe I have been discriminated against . . . **with regard to discipline and discharge** based on my age . . . and disability." *Id.*

---

[1] For clarity's sake, the Court refers to Plaintiff's forced resignation as a termination or firing.

(emphasis added). Plaintiff's charge does not state that Plaintiff requested a reasonable accommodation or that Plaintiff could have performed either nurse position with a reasonable accommodation. *See id.*

Plaintiff filed a Complaint in September 2010, which he amended twice. *See* Doc. Nos. 1, 4, 16. Plaintiff asserts claims under the ADA for disparate treatment and failure to provide a reasonable accommodation. Plaintiff also asserts an age discrimination claim under the ADEA. At the close of discovery, Defendant moved for summary judgment. Doc. No. 41. Defendant argues that the Court lacks subject matter jurisdiction over Plaintiff's reasonable accommodation claim. Defendant also contends that it terminated Plaintiff for nondiscriminatory reasons, and that the evidence does not support a reasonable inference that these reasons were pretexts for disability or age discrimination. Plaintiff filed an Opposition and Defendant a Reply, and the matter is ripe for review.

## II.    STANDARD OF REVIEW

### A.    Subject Matter Jurisdiction

A plaintiff asserting an ADA claim "has the burden of proving the existence of subject matter jurisdiction." *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999). Courts may consider materials outside the pleadings to determine whether they have subject matter jurisdiction. *See Zander v. United States*, 843 F. Supp. 2d 598, 603 (D. Md. 2012) (internal quotation marks omitted) (citing *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir. 2002)).

### B.    Summary Judgment

Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Material disputes are those that "might affect the outcome of the suit under the governing law." *Id.*

Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, "[t]he nonmoving party . . . cannot create a genuine dispute of material fact through mere speculation or the building of one inference upon another." *See Beal v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted). Further, if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.   LEGAL ANALYSIS

### A.   Subject Matter Jurisdiction

Defendant argues that the Court lacks subject matter jurisdiction over Plaintiff's reasonable accommodation claim because it is not reasonably related to the allegations in his

EEOC charge. Predictably, Plaintiff responds that his reasonable accommodation claim is reasonably related to his charge.

"Prior to filing a [lawsuit] alleging violations of the ADA . . . , a plaintiff must first exhaust administrative remedies." *Snead v. Bd. of Educ. of Prince George's Cnty.*, 815 F. Supp. 2d 889, 894 (D. Md. 2011) (citations omitted). "Under [the ADA], the exhaustion requirements and filing procedures are identical to those applicable to claims under Title VII." *Lewis v. MV Transp., Inc.*, Civil Action No. 8:12–cv–00983–AW, 2012 WL 4518541, at *2–3 (D. Md. Sep. 28, 2012) (alteration in original) (citation and internal quotation marks omitted).

"Before a plaintiff has standing to file suit under Title VII, he must exhaust his administrative remedies by filing a charge with the EEOC." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) (citation omitted). The contents of the charge determine the scope of the plaintiff's right to file a federal lawsuit. *Id.* (citation omitted). Usually, "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent [employment discrimination] lawsuit." *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996) (citations omitted). Thus, plaintiffs typically may not bring claims where the EEOC charge alleges discrimination on one theory and the complaint alleges discrimination on a separate theory. *See Bryant*, 288 F.3d at 132–33. This rule applies even where the discrimination that the plaintiff grounds on separate theories relates to the same protected characteristic. *See Mayers v. Wash. Adventist Hosp.*, 131 F. Supp. 2d 743, 747–48 (D. Md. 2001).

In *Mayers*, the employee asserted disability discrimination claims for reasonable accommodation and disparate treatment. *See id.* The defendant argued that the Court lacked

subject matter jurisdiction over the plaintiff's reasonable accommodation claim because it was not reasonably related to the allegations in her charge. *See id.* The Court agreed, concluding that there was "no factual predicate in the EEOC charge to support a reasonable accommodation claim." *Id.* at 747. The Court reasoned that the charge specifically confined the dates of the alleged discrimination to the day of the plaintiff's termination. *Id.* The Court further reasoned that the charge was devoid of any request for a reasonable accommodation. *See id.*

The facts in this case are similar to those in *Mayers*. Here, Plaintiff's charge appears to confine the dates of the alleged discrimination to the two dates on which Defendant disciplined and terminated Plaintiff. *See* Doc. No. 43-1. Furthermore, as in *Mayers*, the charge does not state that Plaintiff requested a reasonable accommodation or that Plaintiff could have performed his job duties with a reasonable accommodation. Therefore, *Mayers* indicates that the Court lacks subject matter jurisdiction over Plaintiff's reasonable accommodation claim.

The charge contains additional allegations that, when coupled with the preceding considerations, compel the conclusion that it is not reasonably related to Plaintiff's reasonable accommodation claim. Plaintiff explicitly states that "I believe I have been discriminated against . . . **with regard to** discipline and discharge based on my . . . disability." Doc. No. 43-1, at 17 (emphasis added). The preposition "with regard to" specifies that the noun phrase appearing after it (discharge based on disability) is the type of discrimination at issue. Furthermore, the charge contains factual predicates purporting to prove that Defendant's decision to discharge Plaintiff was pretextual. The charge states: "I was told the reason for my discharge was due to . . . being a 'liability.' Other similarly situated individuals have committed the same violations of policies; however, have been allowed to continue their employment." *Id.* As the Court explains later in

this Opinion, however, a disability discrimination claim pursued under the pretext framework is legally and analytically distinct from a reasonable accommodation claim.

For the foregoing reasons, Plaintiff's reasonable accommodation claim is not reasonably related to his EEOC charge. Accordingly, the Court lacks subject matter jurisdiction over this claim.

**B.     ADEA**

Plaintiff has not submitted any direct evidence that Defendant discriminated against him because of his age. Therefore, Plaintiff presents a disparate treatment claim under the ADEA. In a disparate treatment case under the ADEA, "liability depends on whether the protected trait . . . actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (citations omitted). For age to actually motivate an employer's decision, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (citations omitted). For age to be the but-for cause of the employer's adverse decision, it must play a role in the process and have a "determinative influence on the outcome." *Biggins*, 507 U.S. at 610. An employer's reliance on factors that are analytically distinct from age in reaching the adverse decision rules out age as its but-for cause. *See id.* at 611. An employer relies on factors that are analytically distinct from age in making an adverse decision where the factors fail to implicate "inaccurate and stigmatizing stereotypes" of older employees, such as the belief that "productivity and competence decline with old age." *See id.* at 610–11. Therefore, to prevail on an ADEA claim, plaintiffs must prove by a preponderance of the evidence that (1) the employer based its adverse decision on such inaccurate and stigmatizing stereotypes and that (2) the inaccurate and stigmatizing stereotypes had a

determinative influence on the decision. *See Gross*, 557 U.S. at 177–78 (citation omitted); *Biggins*, 507 U.S. at 610.

In this case, no reasonable juror could conclude that Defendant based its decision to terminate Plaintiff on inaccurate and stigmatizing stereotypes, or that such stereotypes had a determinative influence on the decision. Plaintiff argues that Defendant discriminated against him because Defendant disciplined younger nurses who made comparable medication errors less severely than it did him. Plaintiff also argues that Defendant's assertion that it terminated him because he failed to promptly schedule a patient to see her primary care physician lacks credence. Although Plaintiff identifies two nurses whom Defendant did not discipline as severely as Plaintiff for making comparable medication errors, Plaintiff ignores that Defendant disciplined a third, older nurse who made a similar mistake less severely than it did Plaintiff. *See* McKay-Mahaffey Dep. 34–36, Doc. No. 42-5. Furthermore, the two younger nurses whom Defendant disciplined less harshly are not similarly situated to Plaintiff. First, unlike Plaintiff, they satisfactorily explained why they made their medication errors. *Compare* Pl.'s Dep. 81–82, Doc. No. 41-3, *with* McKay-Mahaffey Aff. ¶¶ 6–7, Doc. No. 41-4; *cf. Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010) (plaintiffs are not similarly situated to their comparators where "mitigating circumstances" distinguish the comparators' conduct). Second, whereas Defendant based its decision to terminate Plaintiff on two separate errors, Plaintiff has shown that his purported comparators committed only one. *Cf. Yoon v. Sebelius*, 481 Fed. App'x 848, 850 (4th Cir. 2012) (citation omitted) (affirming grant of summary judgment against Asian plaintiff asserting race and national origin discrimination claims, partly because there was no "suggestion that any of the Caucasian nurses had any history of misconduct or had received previous reprimands").

Plaintiff responds that the second error—failing to promptly schedule the patient to see her primary care physician—is a pretext for discrimination. Specifically, Plaintiff contends that Defendant's nondiscriminatory reason (Plaintiff's errors and their link to patient safety) is false. To support this argument, Plaintiff makes four primary points: (1) Plaintiff had received a positive performance review; (2) Defendant has not identified a policy requiring its nurses to promptly schedule patients to see their primary care physician; (3) Plaintiff complied with prior instructions Defendant gave him to refrain from double-booking patients; and (4) Plaintiff's failure to schedule the patient to see her primary care physician did not harm her.

These points are not probative of pretext. The Court rejects the relevance of point (1) outright. Although Defendant evidently gave Plaintiff a strong performance review, the review is for the period of January 1, 2006 to December 31, 2006. Doc. No. 43-2, at 6. Defendant did not terminate Plaintiff until March 20, 2008 or thereabouts. The 14-month gap between Plaintiff's performance review and the acts for which Defendant fired him renders the performance review irrelevant. *See O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995) (citation omitted) (1989 performance review irrelevant to assessing plaintiff's performance eight months later), *rev'd on other grounds*, 517 U.S. 308 (1996). As to point (2), Plaintiff has identified no authority proposing that an employer's decision to terminate an employee for a reason not memorialized in an official policy is improper. Plaintiff's proposition is inconsistent with the concept of at-will employment. Furthermore, it would pressure employers to enumerate all the conceivable acts for which they could terminate employees in a formal policy. In this scenario, if employers fail to predict an employee's future misconduct, they would be left with the Hobson's choice of firing him and potentially incurring civil liability or retaining him and potentially harming their business and/or endangering their clients. Point (3) lacks probative

value because Plaintiff's testimony that Defendant instructed him not to double-book patients is vague and self-serving. *See* Pl.'s Dep. 107, Doc. No. 43-1. Furthermore, Plaintiff testified that Defendant told him that he could double-book if he discussed it with the doctor or various nurses. *See id.* Yet Plaintiff concedes that he made no effort to discuss double-booking the patient with either the doctor or another nurse. *Id.* Finally, the fact that the patient apparently suffered no harm lacks relevance. *See Holder v. City of Raleigh*, 867 F.2d 823, 829 (4th Cir. 1989) ("Bad or mistaken reasons for a decision may yet be non-discriminatory."). And it does not follow that similar future incidents will not harm patients. Although Plaintiff seems to subjectively believe otherwise, "the perceptions of an employee's supervisors . . . matter in determining whether the employee is performing [his] job satisfactorily." *Hadrosek v. Paging Network, Inc.*, No. 96-2453, 1998 WL 390579, at *3 (4th Cir. June 26, 1998) (citing *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)); *accord Evans*, 80 F.3d at 960.

For these reasons, no reasonable juror could conclude that Defendant based its decision to terminate Plaintiff on inaccurate and stigmatizing stereotypes, or that such stereotypes had a determinative influence on the decision. Although firing an employee for deteriorating performance could mask the belief that the employee's productivity or competence has declined with old age, Plaintiff has not submitted sufficient evidence for a reasonable juror to so conclude. And even if Plaintiff's evidence supported a weak inference of age-based animus, there is insufficient evidence to conclude that such animus had a determinative influence on Defendant's

decision. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's age discrimination claim.[2]

## C.     ADA

Defendant allegedly discriminated against Plaintiff in the winter/spring of 2008. Preliminarily, then, the Court must decide whether to apply the ADA or the ADA Amendments Act of 2008 (ADAAA). *See* ADAAA, Pub. L. No. 110–325, 122 Stat. 3553 (codified in scattered sections of 42 U.S.C.A.). Section 8 of the ADAAA expressly provides that both the ADAAA and its amendments "shall become effective on January 1, 2009." 29 U.S.C.A. § 705 (West 2008) (note). Consistent with the majority of circuit courts, the Fourth Circuit has held that the ADAAA does not apply retroactively. *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 151–52 (4th Cir. 2012). The *Reynolds* court further held that courts must apply the ADA to alleged discrimination occurring before 2009 even where, as here, the ADAAA is in full effect when the district court renders its decision. *See id.* Accordingly, the ADA applies in this case.

The obligation to apply the ADA rather than the ADAAA is consequential. Before Congress enacted the ADAAA, courts relied on a pair of Supreme Court cases that created "a demanding standard for qualifying as disabled." *Id.* (citing *Toyota Motor Mfg., Ky., Inc. v.*

---

[2] Neither the Supreme Court nor the Fourth Circuit has held that the *McDonnell Douglas* framework applies to ADEA claims. *Gross*, 557 U.S. at 174 ("This Court has never held that this burden-shifting framework applies to ADEA claims. And, we decline to do so now."). *Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)) (noting that the Supreme Court has only assumed, but not decided, that the *McDonnell Douglas* framework applies to ADEA claims). The outcome would be the same were the Court to apply the *McDonnell Douglas* framework because, inter alia, no reasonable juror could conclude that Defendant's nondiscriminatory reasons for firing Plaintiff (errors that threatened patient safety) were pretexts for age discrimination. To bolster this conclusion, the Court incorporates its analysis of Plaintiff's ADEA claim. *See supra*.

*Williams*, 534 U.S. 184 (2002), *superseded by statute*, ADAAA, Pub. L. No. 110–325, 122 Stat. 3553; *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), *superseded by statute*, ADAAA, Pub. L. No. 110–325, 122 Stat. 3553). Indeed, in enacting the ADAAA, Congress sought to "reject the standards enunciated by the Supreme Court . . . that . . . the definition of disability under the ADA "need[s] to be interpreted strictly to create a demanding standard for qualifying as disabled." 42 U.S.C.A. § 12101 (West 2008 & Supp. 2012) (note). Nevertheless, as it must, the Court applies *Toyota*, *Sutton*, and their progeny to analyze Plaintiff's ADA claim.

Pertinently, the ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability" in regard to the discharge of such individual. *See* 42 U.S.C. § 12112(a) (2006). Discrimination under section 12112(a) includes an employer's failure to make reasonable accommodations to the known physical or mental limitations of a "qualified individual with a disability" unless the employer shows that doing so would impose an undue hardship on its operations. *See id.* § 12112(b)(5)(A). The ADA defines the term "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." *Id.* § 12111(8).

Various theories of relief are available under the ADA in the employment context, of which two are relevant here. One, plaintiffs may proceed under the disparate treatment model. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). Disparate treatment occurs when an employer treats some people less favorably than others because of a protected characteristic (e.g., disability). *See id.* at 52 (citation omitted). Employees who assert that their employers have treated them less favorably due to disability but lack direct evidence of discrimination usually proceed under the *McDonnell Douglas* evidentiary framework. *Compare id.* at 53–55 (applying

the *McDonnell Douglas* framework to an ADA claim), *with Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (citation omitted) ("[The] *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); *see also Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) ("[T]he *McDonnell Douglas* scheme of proof does apply to appropriate claims under the ADA."). Two, plaintiffs may assert a "reasonable accommodation claim." *See, e.g.*, *Clev. v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 799 (1999). Reasonable accommodation claims have two primary textual sources under the ADA. *See* Thomas R. Haggard, Understanding Employment Discrimination § 32.05, at 323 (2d ed. 2008). First, to satisfy the threshold question whether the employee is a "qualified individual with a disability," the employee may show that he has a disability and can perform the essential functions of the job with or without a reasonable accommodation. *See* 42 U.S.C. § 12112(8) (2006). Second, as noted, discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." *Id.* § 12112(b)(5)(A).

In this case, Plaintiff asserts claims for both disparate treatment and reasonable accommodation. Before applying the respective frameworks for these claims, the Court must address the preliminary inquiry whether Plaintiff is a "qualified individual with a disability." *See, e.g.*, *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 Fed. App'x 472, 479 (4th Cir. 2010) (citations omitted) ("For both wrongful termination and the failure to provide reasonable accommodation, a plaintiff must first establish that he is a 'qualified individual with a disability' under the ADA."). Thus, the Court must consider whether Plaintiff is (1) disabled and (2) qualified.

> 1.      *Whether Plaintiff is Disabled*

The ADA defines disability as

> (A) a physical or mental impairment that substantially limits one or more of the
>
> major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (2006).

Therefore, to be disabled under the ADA, plaintiffs must show that they have (1) an actual disability, (2) a record of disability, and/or (3) have been "regarded as" having a disability. *See Sutton*, 527 U.S. at 478 (citation omitted). As Plaintiff does not argue that he had a record of disability, the Court considers only definitions (1) and (3).

> a.      Actual Disability

The ADA defines actual disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (2006). This definition has three elements: (1) a physical or mental impairment that (2) substantially limits (3) one or more major life activities. *See id.*; *Toyota*, 534 U.S. at 194–95. The Court assumes that Plaintiff's alleged medical conditions constitute impairments under the ADA. They are: diabetes mellitus, post-traumatic stress disorder; sleep apnea; peripheral neuropathy; and fibromas of the feet. The Court also assumes that Plaintiff's diagnosis that one or more of these impairments limits his "ability to engage in prolonged walking or standing" implicates the major life activity of walking. *See Toyota*, 534 U.S. at 197 (stating, in dicta, that walking is a major life activity). The Court further concludes that Plaintiff's sleep apnea implicates the major life area of sleeping. *Compare Desmond v. Mukasey*, 530 F.3d 944, 953 (D.C. Cir. 2008) (citing

cases) (holding that sleeping qualifies as a major life activity under the Rehabilitation Act), *with Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) (stating that courts usually judge disability discrimination claims under the ADA and Rehabilitation Act under the same standards). Plaintiff also argues that his sleep apnea limits the activity of "memory recall [sic]." Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 12–13, Doc. No. 42. Courts have yet to decide whether memory, per se, is a major life activity. *Compare, e.g.*, *Emerson v. N. States Power Co.*, 256 F.3d 506, 511 (7th Cir. 2001) (assuming that the activities of memory and concentration "feed into the major life activities of learning and working"), *with, e.g.*, *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 861 (8th Cir. 2006) (citing cases) ("[T]hinking and concentrating qualify as 'major life activities' under the ADA."). Given the absence of dispositive authority, and to simplify the analysis, the Court treats memory as a major life activity as well.

The question, then, is whether Plaintiff's impairments "substantially limited" his ambulation, memory, or sleep. An impairment substantially limits one's ability to perform a major life activity only where it "prevents or severely restricts" the individual from doing the activity. *See Toyota*, 534 U.S. at 198. Here, Plaintiff does not argue that his impairments completely prevented him from walking, sleeping, or remembering things. Hence, the issue is whether these impairments severely restricted Plaintiff's ambulation, memory, or sleep. Plaintiffs cannot show that an impairment severely restricts a major life activity simply by submitting "evidence of a medical diagnosis of an impairment." *Id.* Rather, they must offer evidence that the impairment causes substantial limitation in terms of their own experience. *Id.* (citation omitted). Furthermore, in determining whether an impairment severely restricts a major life activity, courts must consider the effect of "mitigating measures." *See Sutton*, 527 U.S. at 482–83. Additionally, the date of an adverse employment decision is the relevant date for determining whether the

plaintiff is a qualified individual with a disability. *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000) (citation omitted).

In this case, a reasonable juror could only conclude that Plaintiff's impairments failed to severely restrict his ambulation, memory, or sleep. To support his contrary position, Plaintiff submits three items of evidence: (1) a medical diagnosis; (2) his affidavit; and (3) his deposition testimony. The medical diagnosis is a scant, one-page document stating that Plaintiff has chronic pain in his feet that limits his ability to walk or stand for prolonged periods of time. *See* Doc. No. 43-1, at 15. The diagnosis also vaguely states that "changes in [Plaintiff's] work schedule affect his sleep patterns." *Id.* Plaintiff's doctor then speculates that "[it] is possible that the lapse in memory on the date [in] question was [caused] by [Plaintiff's] chronic pain [and] sleep disorder." *Id.* The diagnosis contains no further information explaining how Plaintiff's impairments affect his ambulation, memory, or sleep. Plaintiff's affidavit is a similarly diaphanous document. Pertinently, it states: "While I worked at [Defendant], I experienced chronic pain in my feet due to the fibromas and my sleep apnea negatively affected my sleeping pattern." Pl.'s Aff. ¶ 3, Doc. No. 44-1.

Plaintiff's deposition testimony also fails to create a triable issue about whether his impairments severely restricted his ambulation, memory, or sleep. Plaintiff testifies that his chronic foot pain precludes him from hunting, fishing, gardening, painting, and diminishes his sex drive. Pl.'s Dep. 171:5–13, Doc. No. 41-3. The connection between Plaintiff's foot pain and some of these activities (e.g., painting and sex) is unclear, and Plaintiff does not specify how his foot pain severely restricts his ability to do them. Even murkier is their relationship to Plaintiff's memory and sleeping impairments. Plaintiff offers no further evidence illustrating the overall importance of these activities in his life. Therefore, although an impairment's impact on

recreational activities may inform whether the impairment severely restricts a major life activity, Plaintiff's testimony fails to create a reasonable inference that his impairments severely restricted his ambulation, memory, or sleep. *Cf. Nuzum v. Ozark Automotive Distribs., Inc.*, 432 F.3d 839, 847 (8th Cir. 2005) (no substantial limitation where plaintiff submitted a medical evaluation and testimony showing limitations in mowing the lawn, throwing, and working on cars).

Even if Plaintiff's medical diagnosis and declarations reasonably supported the inference that his impairments severely restricted his ambulation or memory, a reasonable juror still could only conclude that Plaintiff had no such restrictions when Defendant took the adverse actions. Plaintiff unequivocally stated during his deposition that he "[n]ever" suffered from memory loss when he worked for Defendant and that the memory loss happened "[a]fter [he] was terminated." Pl.'s Dep. 173:10–19, Doc. No. 41-3. As for his chronic foot pain, Plaintiff similarly stated that he "could stand for as long as it took" and that his foot condition did not "substantially impair [his] ability to walk when [he] was working at [Defendant]." Pl.'s Dep. 174:14–175:4, Doc. No. 41-3. Although Plaintiff's medical diagnosis may suggest otherwise, plaintiffs cannot create a genuine dispute of material fact simply by submitting, without explanation, a medical diagnosis that contradicts sworn deposition testimony undercutting the elements of an ADA claim. *Cf. Policy Mgmt.*, 526 U.S. at 806–07.

It is unclear whether Plaintiff suffered from sleep apnea when Defendant made the adverse decisions to discipline and terminate him. Even so, Plaintiff testified that he had managed his sleep apnea. *See* Pl.'s Dep. 170:8–21, Doc. No. 41-3. Likewise, Plaintiff acknowledged that he had a sleep apnea machine that his physician had directed him to use. *See* Doc. No. 41-3, at 77. In view of these mitigating measures, under *Sutton*, no reasonable juror could conclude that Plaintiff's sleep apnea severely restricted his sleep. Moreover, Plaintiff's

medical diagnosis indicates that his irregular work schedule as a nurse contributed to his sleep disorder. *See* Doc. No. 43-1, at 15 (stating that "changes in [Plaintiff's] work schedule affect his sleep patterns"); *see also* McKay-Mahaffey Dep. 76:10–77:20, Doc. No. 41-5 (discussing the long hours and irregularities of Plaintiff's work schedule). Additionally, Plaintiff has submitted no evidence showing the extent to which his sleep apnea deprived him of sleep or how significant this deprivation was compared to an average person. *See* 29 C.F.R. § 1630.2(j)(ii) (2008); *see also Swanson v. Univ. of Cin.*, 268 F.3d 307, 316 (6th Cir. 2001) ("While less than five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population."). Accordingly, for the foregoing reasons, no reasonable juror could conclude that Plaintiff is actually disabled under the ADA.

b.      Regarded as Disabled

Pertinently, the ADA defines disability as being "regarded as" having an impairment that substantially limits one or more major life activities. *See* 42 U.S.C. § 12102(2)(A), (C) (2006). According to one commentator, this is the ADA's most "mysterious" definition of disability. *See* Haggard, *supra* § 31.02(D), at 307. In *Sutton*, the Supreme Court identified two "apparent ways in which individuals may fall within this statutory definition." 527 U.S. at 489. One, an employer "mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities." *Id.* Two, an employer "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Id.* The first definition is inapplicable because Plaintiff asserts that he was impaired.

The issue, then, is whether a reasonable juror could conclude that Defendant mistakenly believed that Plaintiff's actual, nonlimiting impairments substantially limited any of the major life activities discussed above (i.e., walking, memory, or sleep). In other words, the evidence

must support a reasonable inference that Defendant mistakenly believed that Plaintiff's nondisabling impairments severely restricted his ambulation, memory, or sleep. *See Toyota*, 534 U.S. at 198; *Sutton*, 527 U.S. at 491. Furthermore, as Defendant fired Plaintiff, it behooves the Court to address whether Defendant mistakenly believed that Plaintiff's nondisabling impairments severely restricted his ability to work. *See Sutton*, 527 U.S. at 492 (assuming that working is a major life activity).

In this case, a reasonable juror could conclude that Defendant mistakenly believed that Plaintiff's nondisabling impairments severely restricted his ability to walk. Defendant gave Plaintiff the "ADA-Medical Certification" form and asked him to have a medical exam after he improperly administered medication. McKay-Mahaffey Aff. ¶ 9, Doc. No. 41-4. Plaintiff's doctor concluded, however incorrectly, that Plaintiff had several impairments and that at least one of them substantially limited his ambulation. Based in part on the doctor's diagnosis, Defendant reassigned Plaintiff from his position as a lead nurse to the sedentary message management nurse position. *See Wilson v. Phoenix Specialty Mfg. Co., Inc.*, 513 F.3d 378, 385–86 (4th Cir. 2008) (employer's determination that plaintiff could not perform job functions involving activity for which plaintiff impaired probative of employer's perception). Furthermore, the "Corrective Action Plan" Plaintiff and Defendant executed says that Plaintiff has a "disability." *See* Doc. No. 41-3, at 77; *see also Wilson*, 513 F.3d at 385 (pointblank statement that plaintiff "qualifies for ADA designation" probative of employer's perception). And while the evidence shows that Plaintiff was impaired at some point, both Plaintiff and his doctor declared that he could perform at least "more sedentary" nursing duties. *See, e.g.*, Doc. No. 43-1, at 15; *see also Wilson*, 513 F.3d at 386 (testimony from plaintiff and his doctor that plaintiff could perform essential job functions probative of whether employer's perception mistaken).

Thus, drawing all justifiable inferences in Plaintiff's favor, a reasonable juror could conclude that Defendant mistakenly believed that Plaintiff's nondisabling foot impairment severely restricted his ability to walk.

The evidence is insufficient, however, for a reasonable juror to conclude that Defendant mistakenly believed that Plaintiff's other impairments severely restricted his sleep, memory, or ability to work. Unlike it does for his foot condition, Plaintiff's medical diagnosis does not state that Plaintiff's sleep apnea substantially limits his sleep. It is more amenable to the inference that Plaintiff's irregular work schedule affected his sleep patterns. Furthermore, the evidence supports the inference that Defendant based its attempt to accommodate Plaintiff by reassigning him to a more sedentary position on his walking problems, not his sleep disorder. *See* McKay-Mahaffey Aff. ¶¶ 10–11, Doc. No. 41-4; Doc. No. 41-3, at 78. And, as noted above, the evidence compels the conclusion that Plaintiff had managed his sleep apnea. The notion that Plaintiff's impairments severely restricted his memory suffers from graver evidentiary deficiencies. Other than the medical diagnosis, the record is barren of evidence having any tendency to show that Defendant regarded Plaintiff's impairments as a severe restriction on his memory. And, as discussed, the medical diagnosis simply speculates that Plaintiff's impairments could have led to his lapse in memory.

The argument that Defendant mistakenly believed that Plaintiff's impairments severely restricted his ability to work fails on unrelated grounds.  Under *Sutton*, plaintiffs must plead and prove that they are unable to work in a "broad class of jobs" to establish that they are severely restricted in their ability to work. *See* 527 U.S. at 491. The Fourth Circuit has consistently interpreted this rule to bar "regarded as" disability claims where plaintiffs fail to submit evidence showing that their impairments severely restrict their ability to work in a broad class of jobs. *See*

*Boitnott v. Corning Inc.*, 669 F.3d 172, 175 (4th Cir. 2012) (citation omitted); *Davis v. Univ. of N.C.*, 263 F.3d 95, 100 (4th Cir. 2001); *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 704 (4th Cir. 2001). Here, although Defendant inferably believed that Plaintiff could not work as a nurse, the record is empty of evidence indicating that Plaintiff could not work in a broad class of jobs, or that Defendant so believed. Plaintiff does not even make this argument. Therefore, a reasonable juror could not conclude that Defendant mistakenly believed that Plaintiff's impairments severely restricted his ability to work.

In sum, the Court considered whether Defendant mistakenly believed that Plaintiff's impairments severely restricted his ability to walk, sleep, recall things, and work. The Court held that a reasonable juror could find that Defendant harbored such a mistaken belief for only the major life activity of walking. That is, the only way a reasonable juror could conclude that Plaintiff is disabled under the ADA is to find that Defendant mistakenly believed that his foot condition severely restricted his ambulation. Before applying the *McDonnell Douglas* framework to Plaintiff's remaining "regarded as" claim, the Court must address whether Plaintiff was "qualified" under section 12112(a).

2.      *Whether Plaintiff Was Qualified*

The ADA defines "qualified individual with a disability" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12112(8) (2006). This definition divides into two parts: (1) whether the plaintiff can perform the essential functions of the job without a reasonable accommodation; and, if not, (2) whether the plaintiff can perform the essential functions of the job with a reasonable accommodation. If plaintiffs satisfy part (1), courts may proceed to analyze their disparate treatment and/or reasonable accommodation claims. The

failure to satisfy part (1), however, does not end the inquiry. Under part (2), plaintiffs may show that they can perform the essential functions of the job with a reasonable accommodation.

This inquiry faces an initial impediment. The Parties have made only a minimal effort to identify the essential functions of either of the two positions that Plaintiff held (lead nurse and message management nurse). This omission is problematic given the fact-intensive nature of this inquiry. *See* 29 C.F.R. § 1630.2(n)(2) (2008) (stating that a job function may be "considered essential for any of several reasons"). Plaintiff seems to concede that safely administering medication is an essential function of the lead nurse position. *Cf. Shin*, 369 Fed. App'x at 481 (holding that a medical resident was not qualified because, inter alia, he could not provide "safe and appropriate care for patients"). Yet Plaintiff worked as message management nurse when Defendant fired him; it is unclear that Plaintiff's alleged inability to safely administer medication is an essential function of the message management nurse position. It is also unclear that Plaintiff could not safely administer medication when Defendant fired him. Granted, after acknowledging that he improperly administered medication, Plaintiff stated that he did not know how the mistake happened and that he did not want be a liability. With the possible exception of McKay-Mahaffey's affidavit, however, Defendant has cited no evidence showing that Plaintiff could not safely administer medication at the time of his termination, which came approximately two months after Plaintiff committed the medication error. Insofar as McKay-Mahaffey's affidavit

suggests otherwise, Plaintiff's testimony that he could perform the duties of both positions creates a genuine factual dispute on this issue.[3]

For these reasons, a genuine factual dispute exists regarding whether Plaintiff could have performed the essential functions of the job without a reasonable accommodation. Therefore, the record contains sufficient evidence to conclude that Plaintiff was a "qualified individual with a disability." Consequently, the Court need not consider the second part of section 12112(8)'s definition; namely, whether Plaintiff could have performed the essential functions of his job with a reasonable accommodation.

### 3.      *Disparate Treatment Claim*

"Under the *McDonnell Douglas* proof scheme, the plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence." *Ennis*, 53 F.3d at 58. "If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* "If the defendant meets this burden of production, the presumption created by the *prima facie* case 'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

"In general terms, a plaintiff establishes a *prima facie* case by proving a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it

---

[3] Defendant submitted a document titled "Classification Description" purporting to list the duties of the position of lead nurse. The document, however, does not discuss the job functions of a message management nurse. Furthermore, the document is quite vague. Its requirement that the lead nurse must demonstrate "a high level of clinical competency in all areas" appears to be the only facially applicable requirement. *See* Doc. No. 41-3, at 71. Plaintiff concedes, however, that lead nurses must be able to properly administer medication. Therefore, this document fails to compel the conclusion that Plaintiff could not perform his essential job duties.

is more likely than not that the adverse employment action was the product of discrimination." *Id.* (citing cases). "[I]n a typical discharge case brought under the ADA, a plaintiff must prove by a preponderance of the evidence that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Id.* (citations omitted).

In this case, the Court assumes that a reasonable juror could conclude that Plaintiff has satisfied these elements by a preponderance of the evidence. As Defendant disciplined and fired Plaintiff, the Parties do not dispute element (2). The Court further held that a reasonable juror could conclude that Plaintiff was a qualified individual with a disability, thereby satisfying element (1). This determination also satisfies element (3). Although one must question whether "qualified" under the ADA has the same meaning as "performing one's job at a level that met her employer's legitimate expectations," the Court gives Plaintiff the benefit of the doubt. *Cf. Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous."). By contrast, whether the record contains sufficient evidence for a reasonable juror to conclude that Defendant discharged Plaintiff under circumstances raising a reasonable inference of discrimination is squarely in dispute. The Court declines to consider this question here as the ensuing pretext analysis subsumes this consideration.

The next step in the analysis is whether Defendant has produced a nondiscriminatory reason for disciplining, reassigning, and later firing Plaintiff. Defendant maintains that it disciplined and reassigned Plaintiff because of his medication error. Defendant also asserts that it fired Plaintiff because he failed to schedule the patient to see her primary care physician.

Defendant further contends that both of these errors endangered the safety of its patients. All these reasons are nondiscriminatory.

Thus, the question is whether a reasonable juror could conclude that Plaintiff could prove that Defendant's nondiscriminatory reasons were pretexts for discrimination. No reasonable juror could so conclude. As discussed in the analysis of Plaintiff's ADEA claim, Plaintiff argues that Defendant fired him due to his disability because Defendant disciplined nondisabled nurses who made comparable medication errors less severely than it did Plaintiff. Plaintiff also argues that Defendant's contention that it terminated him because he failed to schedule the patient to see her primary care physician is false. Granted, Plaintiff identifies three nurses whom Defendant did not discipline as severely as Plaintiff even though they made similar medication mistakes. These three nurses, however, are not similarly situated to Plaintiff. First, unlike Plaintiff, they satisfactorily explained why they erred. *Compare* Pl.'s Dep. 81–82, Doc. No. 41-3, *with* McKay-Mahaffey Aff. ¶¶ 6–8, Doc. No. 41-4. Second, whereas Defendant based its decision to terminate Plaintiff on two separate errors, Plaintiff has shown that his purported comparators committed only one. Furthermore, although Defendant reassigned Plaintiff, Plaintiff's union representative evidently first raised this possibility. McKay-Mahaffey Aff. ¶ 11, Doc. No. 41-4. Aside from the fact that Plaintiff requested the accommodation, the reassignment was reasonable considering Plaintiff's concession that he did not know how the error happened, wanted to see his doctor, and did not want to be a liability. *See* Pl.'s Dep. 81–82, Doc. No. 41-3; *see also Young v. United Parcel Serv., Inc.*, No. 11–2078, 2013 WL 93132, at *5 (4th Cir. Jan. 9, 2013) (publication forthcoming) (citation omitted) (medical inquiries do not constitute disability discrimination where the employer has "objective facts" suggesting that an employee might have lost the ability to perform central job functions).

Plaintiff responds that the second error—failing to schedule a patient to see her primary care physician—proves pretext because Defendant's justification for it is false. To buttress his contention, Plaintiff makes four primary points: (1) Plaintiff received a positive performance review in 2006; (2) Defendant has not identified an official policy that required Plaintiff to promptly schedule the patient to see her primary care physician; (3) Plaintiff allegedly complied with prior instructions Defendant gave him to refrain from double-booking patients; and (4) the patient apparently suffered no ill effects from Plaintiff's decision.

The Court carefully analyzed these points above and concluded that they lacked probative force. To reiterate, point (1) is immaterial because the performance review is for 2006 and Defendant terminated Plaintiff in 2008. As to point (2), Plaintiff has identified no authority proposing that an employer's decision to terminate an employee for a reason not memorialized in an official policy impels an inference of impermissible animus. As noted, this argument also carries negative policy implications. Point (3) lacks probative value because Plaintiff's testimony that Defendant instructed him not to double-book patients is vague and self-serving. Furthermore, Plaintiff testified that Defendant told him that he could double-book if he discussed it with the doctor or various nurses. Yet Plaintiff concedes that he made no effort to discuss double-booking the patient with either the doctor or another nurse. Finally, the fact that the patient suffered no harm is irrelevant.

For the reasons set forth above, no reasonable juror could conclude that Defendant's nondiscriminatory reasons for disciplining, reassigning, and firing Plaintiff were pretexts for discrimination. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's disparate treatment claim.

4.      *Reasonable Accommodation*

Plaintiff's reasonable accommodation claim would fail even if the Court had jurisdiction over it. As discussed above, the concept of reasonable accommodation factors into the analysis whether someone has been discriminated against under the ADA twice. *See supra* p. 14. The evidence overwhelmingly shows that Defendant accommodated Plaintiff's walking impairment by transferring him to the sedentary message management nurse position. Nevertheless, Defendant argues that Plaintiff should have reengaged him in an "interactive process" to see if he could work another position. *See* 29 C.F.R. 1630.2(o)(3) (2008). However, a reasonable juror could conclude that Defendant regarded Plaintiff as disabled only due to his walking impairment, and the mistake Plaintiff allegedly made as a message management nurse does not relate to walking. Thus, Plaintiff bore the burden to request a new accommodation.[4] Plaintiff failed to carry this burden because there is no evidence that he requested, identified, or proposed a new accommodation.

Moreover, failing to provide a reasonable accommodation to an employee whom an employer merely "regards as" disabled does not constitute discrimination under the ADA. The Ninth Circuit has held that employers have no duty to accommodate an employee in a "regarded as" case, partly based on its assessment that "the weight of circuit authority disfavors interpreting the ADA to require accommodation for 'regarded as' plaintiffs." *Kaplan v. City of North Las*

---

[4] Nearly every circuit court, including the Fourth Circuit, has held or strongly suggested that the Plaintiff bears the initial burden of requesting, identifying, or proposing a reasonable accommodation. *See Halpern*, 669 F.3d at 465; *Shin*, 369 Fed. App'x at 481; *see also Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 81 (1st Cir. 2010); *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006); *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001); *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 259 (6th Cir. 2000); *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2nd Cir. 1999); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171–72 (10th Cir. 1999); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997); *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996); *cf. U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002). *But cf. Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266–67 (D.C. Cir. 2008); *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir. 1996).

*Vegas*, 323 F.3d 1226, 1231–32 (9th Cir. 2003). Although the Fourth Circuit has yet to resolve this issue, it is the prevailing view in this District. *Compare Young*, 2013 WL 93132, at *11 n.8 (noting that the Fourth Circuit has yet to decide the question), *with Lyons v. Shinseki*, Civil No. WDQ–08–2532, 2011 WL 1230477, at *7 (D. Md. Mar. 28, 2011), *and Young v. United Parcel Serv., Inc.*, Civil Action No. DKC 08–2586, 2011 WL 665321, at *17–20 (D. Md. Feb. 14, 2011) (citation omitted).

The fact that the ADAAA expressly does not require employers to accommodate employees who are disabled thereunder only because their employers regarded them as such also supports this conclusion. *See* 42 U.S.C.A. § 12201(h) (West 2008 & Supp. 2012). The ADAAA is remedial in nature and expressly aims to override *Toyota* and *Sutton* and the demanding standard they created for qualifying as disabled under the ADA. If Congress disagreed with the restrictive majority view that reasonable accommodations are unavailable to "regarded as" plaintiffs, Congress could have overridden these cases as it did *Toyota*, *Sutton*, and their progeny. Instead, Congress enacted a provision that conforms to the restrictive majority view. Although one can draw other inferences from this statutory history, it suggests that Congress agreed with the restrictive majority view. Accordingly, Plaintiff's reasonable accommodation claim would fail even if the Court had jurisdiction over it.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment. A separate Order, closing the case with prejudice, follows.

| March 20, 2013 | /s/ |
|---|---|
| Date | Alexander Williams, Jr. |
| | United States District Judge |